Case No. 23-1901

_____

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

KIM ANNE FARRINGON,

Petitioner,

v.

U.S. DEPARTMENT OF TRANSPORTATION,

Respondent.

_____

On petition for review from the Merit Systems Protection Board
in AT-1221-09-0543-B-2

_____

OPENING BRIEF OF PETITIONER

_____

Thad M. Guyer
T.M. Guyer and Ayers & Friends, PC
116 Mistletoe Street
Medford, OR  97501

Thomas M. Devine
Government Accountability Project, Inc.
1612 K Street NW, Suite 11oo
Washington, DC 20006

Counsel for Petitioner

**Case No. 23-1901**

_____

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

_____

**KIM ANNE FARRINGON**
v.
**U.S. DEPARTMENT OF TRANSPORTATION**

_____

**CERTIFICATE OF INTEREST**

_____

Counsel for Petitioner certifies the following:

1. The full names of the parties I represent are Kim Anne Farrington

2. The name of the real party in interest is the same.

3. All parent corporations and publicly held companies that own 10 percent or more of the stock of the party I represent are: N/A

4. The names of all law firms and the partners or associates that appeared before the MSPB for the party I represent are (A) The Government Accountability Project, Inc. and T.M. Guyer and Ayers & Friends, PC,  Thad M. Guyer, Esq., Stephani L. Ayers, Esq. and Thomas M. Devine, Esq.; and (B) those law firms and lawyers have or are expected to enter appearances herein.

5. To the best of counsel's knowledge, there are no cases pending in this or any other court or agency that will directly affect or be affected by this Court's decision in this matter.

6. The information required by FRAP 26.1(b) and (c) is:  N/A


Date:  September 27, 2023          Respectfully submitted,

/s/ Thad M. Guyer

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST............ ............................................... 2

TABLE OF CONTENTS ............................................................... 3

TABLE OF AUTHORITIES............................................................ 5

I.  JURISDICTIONAL STATEMENT............................................. 7

II.  STATEMENT OF ISSUES PRESENTED FOR REVIEW...................... 7

III. STATEMENT OF THE CASE ................................................... 8

   A.    2012 Remand and Hearing, and 2016 Initial Decision.....................8

   B.    AJ's 2016 Normal Duties/Normal Channels Implicit Decision........10

   C.    2016 AJ Alternative Conclusion of Lack of Reasonable Belief:......10

   D.    The 2023 Board Affirms the 2016 AJ Conclusions on Normal Duties/Normal Channels and Lack of Reasonable Belief:..........................12

   E.    Failure to Prove Reprisal:...................................................13

IV.    STATEMENT OF RELEVANT FACTS...........................................14

   A.    Background of Employment Relationship:.....................................14

   B.    Farrington's Regularly Assigned Duties and Channels:...................15

   C.    Farrington Recognized for Her Regulatory Knowledge:.................16

   D.    The AirTran Parallel FAA and NTSB Accident Investigations:.......17

   E.    Protected Disclosures to FAA and NTSB in May 2003:...................19

   F.    Walker Gags Farrington from AirTran Communications:.................20

   G.    FAA's Deliberate Infliction of Mental Distress: .............................22

   H.    Reasonable Belief in Regulatory and Safety Failures:......................22

V.  SUMMARY OF THE ARGUMENT........................................................27

ARGUMENT

VI.    STANDARD OF REVIEW....................................................28

VII.    SUMMARY OF THE BOARD'S ORDER.........................................29

VIII.    THE BOARD ERRED AS A MATTER OF LAW IN FAILING TO PROPERLY APPLY THE WPEA 2012 AMENDMENTS...............32

   A.    Distinguishing Constitutional from Statutory Claims:.....................32

   B.    Congress's Intention to Restrict Agency "Duty Speech" Defense:.. 33

   C.    Importance of Employee Duties Actually Performed:......................34

IX.    THE BOARD ERRED AS A MATTER OF LAW IN FAILING
       TO PROTECT FARRINGTON'S USE OF DISCLOSURE
       CHANNELS ................................................................... 34

   A.    The WPEA Protects all Disclosure Channels: ................................ 34

   B.    Protection under Section 2302(f)(2) is not Channel Dependent: ..... 36

   C.    There Are No Exceptions or Reduced Protections for External
         Channel Disclosures: ........................................................ 38

X.     INSTEAD OF PROTECTING DISCLOSURE CHANNELS, THE
       BOARD AND THE AGENCY WEAKENED THEM ..................... 41

   A.    The Board Applied Channel Analysis Rejected by Congress: ........ 41

   B.    The Board Undermined the NTSB as a Protected External
         Disclosure Channel: .......................................................... 42

   C.    Farrington's Job Was Not to Regularly Investigate and Disclose
         Agency Wrongdoing to FAA Division Level Officials: ................ 44

   D.    The Board Erroneously Failed to View Reasonable Belief
         from Farrington's Perspective ............................................. 44

XI.    IN ITS NEW "REPRISAL" JURISPRUDENCE, THE BOARD
       ATTEMPTS TO ABROGATE THE BURDEN OF PROOF
       REGIME LONG SINCE ESTABLISHED BY CONGRESS. ........... 46

XII.   FARRINGTON MET HER BURDEN TO PROVE REPRISAL ...... 50

XIII.  SECTIONS 2302(F)(1) AND (2) SHOULD BE VIEWED
       IN A FIRST AMENDMENT DUTY SPEECH CONTEX ........... 53

   A.    Disclosures and Speech Related to Employment Duties,
         but not Compelled by Them are Protected Under the First
         Amendment and the WPEA: .............................................. 54

   B.    The Board Conflated Farrington's Work Related Knowledge
         with Work Mandates: ........................................................ 54

   C.    The Board Did not Engage in the Required Rigorous Scrutiny of
         Asserted Job Duty Assertions by the Agency: ........................ 55

XIV.   CONCLUSION ............................................................. 57

ADDENDUM ........................................................................ 59

CERTIFICATE OF SERVICE ................................................. 62

RULE 32(a)(7)(C) CERTIFICATE ............................................ 63

# TABLE OF AUTHORITIES

## Cases

*Acha v. Dep't of Agric.*, 841 F.3d 878, 882 (10th Cir. 2016) .................................31

*Anoruo v. VA*, No. 2023-1114, 2023 U.S. App. LEXIS 21460, at *6-7 (Fed. Cir. Aug. 16, 2023) ...............................................................................................53

*Boyd v. Dep't of Homeland Sec.*, 2015 MSPB LEXIS 5631, p. 10 (June 25, 2015); *Chavez*..............................................................................................................47

*Brock v. DOT*, No. 2023-1133, 2023 U.S. App. LEXIS 24745, at *15-16 (Fed. Cir. Sep. 19, 2023) .....................................................................................................52

*Carey v. DVA*, 93 M.S.P.R. 676 (2003 ....................................................................47

*Carr. v. Social Security Administration,* 185 F.3d 1318 1323 (Fed. Circ. 1999).....48

*Chambers v. Department of the Interior*, 602 F.3d 1370, 1376 (Fed. Cir. 2010)....11

*Coppola v. Dep't of Veterans Affairs*, 770 F. App'x 573, 576 (Fed. Cir. 2019) (...49, 52

*Crowell v. Benson*, 285 U.S. 22, 52 S. Ct. 285, 76 L. Ed. 598 (1932)....................29

*Day v. Department of Homeland Security*, 119 M.S.P.R. 589 (2013) ......................9

*Farrington v. Department of Transportation*, 118 M.S.P.R. 331, MSPB Docket No. AT-1221-09-0543-W-1, ¶ 9 (July 16, 2012)....................................................8

*Fellhoelter v. Dep't Agriculture*, 568 F. 3d 965, 971 (Fed. Circ. 2009); .................51

*Ferrell v. HUD*, No. 2022-1487, 2023 U.S. App. LEXIS 3146, at *7-8 (Fed. Cir. Feb. 9, 2023) ................................................................................................45

*Fields v. Dep't of Justice*, 452 F.3d 1297, 1305 (Fed. Cir. 2006) ...........................40

*Francisco v. Office of Pers. Mgmt.*, 295 F.3d 1310, 1314 (Fed. Cir. 2002) ...........41

*Garcetti v. Ceballos*, 547 U.S. 410 (2006)*,* .....................................................32, 53

*Gonzalez v. Department of Transportation*, 109 M.S.P.R. 250, p. 20 (2008); *S* .....47

*Gryder v. Department of Transportation*, 100 M.S.P.R. 564, ¶ 13 (2005) .............11

*Hagmeyer v. United States*, 757 F.2d 1281, 1284 (Fed. Cir. 1985),.......................51

*Heath v. Dep't of the Army*, 640 F. App'x 989, 990 (Fed. Cir. 2016)......................31

*Horton v. Dep't of the Navy*, 66 F.3d 279, 283 (Fed. Cir. 1995):.....................33,44

*Huffman v. Office of Pers. Mgmt.*, 263 F.3d 1341, 1348 (Fed. Cir. 2001).............39

*Iglesias v. United States Agency for Int'l Dev.*, Civil Action No. 17-285 (JDB), 2018 U.S. Dist. LEXIS 175806, at *27 n.14 (D.D.C. Oct. 12, 2018).................32

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2424 (2022), .....................53,56

*Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999). .....................................45

*Lane v. Franks*, 573 U.S. 228 (2014) .......................................................................53

*Layton v. MSPB*, 392 F. App'x 875, 877-78 (Fed. Cir. 2010). *Kahn* .....................39
*Leshinsky v.* Telvent GIT, S.A., 942 F. Supp. 2d 432, 449 (S.D.N.Y. 2013) ( .........31
*Losada v. DOD*, 601 F. App'x 940, 943 (Fed. Cir. 2015) ......................................38
*Marano v. Department of Justice*, 2 F.3d 1137, 1139 (Fed. Cir. 1993) ..................33
*McEntee v. MSPB*, 404 F.3d 1320, 1325 (Fed. Cir. 2005)......................................29
*Miller v. DOJ*, 842 F.3d 1252, 1257 (Fed. Cir. 2016) (citations............................52
*Parrott v. Merit Sys. Prot. Bd.*, 519 F.3d 1328, 1334 (Fed.Cir. 2008). There ........29
*Powers v. Dep't of Navy,* 69 MSPB 150, 156 (1995) ...............................................51
*Reardon v. Dep't of Homeland Sec.*, 384 F. App'x 992, 994 (Fed. Cir. 2010). ........45
*Redschlag v. Department of the Army,* 89 M.S.P.R. 589, p. 87 (2001) ..................47
*Rickel v. Dep't of the Navy*, 31 F.4th 1358, 1364 (Fed. Cir. 2022), ........................52
*Rutter v. DOJ* , 2018 MSPB LEXIS 500, *16-17 (M.S.P.B. February 6, 2018) .....49
*Rzucidlo v. Department of the Army*, 101 M.S.P.R. 616, ¶ 13 (2006); ....................11
*San Diego* v. *Roe*, 543 U. S. 77, 80 (2004), the ........................................................55
*Sheehan v. Dep't Navy,* 230 F.3d 1009, 1014 (2001);............................................51
*Spruill v. MSPB,* 978 F.2d 679, 681 (Fed. Circ. 1992). ...........................................50
*Taft v. Agric. Bank of China Ltd.*, 156 F. Supp. 3d 407, 414-15 (S.D.N.Y. 2016).  "
    ...........................................................................................................................31
*Valerino v. HHS*, 7 MSPR 487, 489-90 (1981) ........................................................51
*Warren v. Dep't of Army*, 804 F.2d 654, 656 (Fed. Cir. 1986),.........................47,51
*Webster v. Dep't of the Army,* 911 F.2d 689, 690 (Fed. Cir. 1990). .......................51
*Whitmore v. Dep't of Lab.*, 680 F.3d 1353, 1364 (Fed. Cir. 2012) ........................53
*Willis v. Dep't of Agric.*, 141 F.3d 1139, 1144 (Fed. Cir. 1998)..............................33

## Statutes

5 U.S.C. § 1221(e)(1) ..............................................................................................30,33
5 U.S.C. § 2302(b)(8)(A), .............................................................................................13
5 U.S.C. § 2302(f)(1) and (2), ......................................................................................36
5 U.S.C. § 2302(f)(2)....................................................................................... 10-12,30-34
5 U.S.C. § 7703(c)........................................................................................................28
5 U.S.C.S. § 2302(a)(2)(D) ...........................................................................................35

## Other Authorities

134 *Cong. Rec*. 19,981 (1988) and 135 *Cong. Rec.* 4509 (1989)............................47

## Regulations

14 C.F.R. § 121.417.....................................................................................................26
5 C.F.R. § 1209.4(b .....................................................................................................45

# I.  JURISDICTIONAL STATEMENT

This Court has jurisdiction under 5 USC 7703(a)(1) which provides: "Any employee or applicant for employment adversely affected or aggrieved by a final order or decision of the Merit Systems Protection Board may obtain judicial review of the order or decision." The initial decision ("ID", (Appx1) in this case was entered on June 1, 2016, and the final reviewable MSPB order was entered on March 15, 2023. (Appx1). Petitioner timely filed her petition review on Monday, May 15, 2023, within the 60 days allowed by statute, the 60th day in what city gods music exactly what I need god set a fire having been a Sunday.

# II.  STATEMENT OF ISSUES PRESENTED FOR REVIEW

(1) Did the Board err in applying the legislatively overruled *Huffman* holding denying full 5 U.S.C. Section 1221(e) contributing factor/clear and convincing evidence regime protections to disclosures made pursuant to Farrington's "ordinary duties" and "normal channels"?

(2) Did the Board err in applying the heightened burden of proof standard of "reprisal" prescribed by 5 U.S.C. Section 2302(f)(2) to Farrington's disclosures?

(3) Did the Board err in failing to protect the NTSB independent and external disclosure channel for Farrington and FAA employees who participate in air carrier accident investigations?

(4) Did the Board err in failing to protect the voluntary internal FAA Division level disclosure channel for Farrington and MCO employees who accepted occasional open-door invitations to discuss any subject?

(5) Did the Board err in affirming the AJ conclusion that Farrington could not have objectively reasonably believed the FAA and AirTrans violated regulatory and safety rules?

### III.  STATEMENT OF THE CASE

The Board's March 15, 2023, final order denied the petition for review, but modified the initial decision to find that 5 U.S.C. § 2302(f)(2) applies to this matter because the appellant's disclosures were made in the normal course of her duties through normal channels. The Board vacated the administrative judge's findings regarding laches and the agency's burden to prove by clear and convincing evidence that it would have taken the actions absent the appellant's whistleblowing disclosures. Except as expressly modified, the Board affirmed the initial decision.

**A.  <u>The 2012 Remand and Hearing, and 2016 Initial Decision:</u>**

In its 2012 decision, *Farrington v. Department of Transportation*, 118 M.S.P.R. 331, MSPB Docket No. AT-1221-09-0543-W-1, ¶ 9 (July 16, 2012), the Board remanded for further adjudication the September 1, 2010 initial decision without hearing concluding that none of Farrington's disclosures could confer jurisdiction on the Board due to her failure to make non-frivolous allegations that

they were made outside her normal work responsibilities and normal channels. On November 14, 2012, the administrative judge held a hearing. After the appellant testified, the agency moved to dismiss the appeal for lack of jurisdiction. After allowing the appellant to make a response, the administrative judge indicated that she was going to find in favor of the agency on the *Huffman* normal duties/normal channel jurisdictional disqualification. At that point, the administrative judge offered both parties the opportunity to go forward in order to make whatever record they might wish, and both parties indicated that they did not wish to do so.

Despite her finding of lack of jurisdiction, the administrative judge indicated she would allow the parties to submit closing arguments. However, before the administrative judge issued an initial decision, the Whistleblower Protection Enhancement Act of 2012 (WPEA) was signed into law on November 27, 2012, significantly changing whistleblower law for federal employees. On December 14, 2012, the Board certified an interlocutory appeal as to retroactivity, and Farrington was allowed a voluntary dismissal without prejudice to await the retroactivity decision. (ID 2016, Appx. 2). On June 26, 2013, the Board issued its decision holding that the WPEA was retroactive to pending cases. *Day v. Department of Homeland Security*, 119 M.S.P.R. 589 (2013). On July 23, 2013,

Farrington refiled her appeal, which was then assigned to a new administrative judge as the administrative judge originally assigned to this appeal had retired.

### B.  The AJ's 2016 Normal Duties/Normal Channels Implicit Decision:

A full hearing was conducted, and despite the Board's 2012 remand order, the new AJ made no explicit conclusion as Farrington's normal duties and job channels.  However, the Board's March 15, 2023, final decision concluded that the AJ had implicitly done so by the following finding that any protection Farrington had was limited to 5 U.S.C. § 2302(f)(2):

> In amending the WPA, however, the WPEA created an additional burden where investigating and reporting wrongdoing is an integral part of an employee's everyday job duties. Specifically, section 2303(f)(2) requires employees whose job consists of such responsibilities to demonstrate that a personnel action was taken "in reprisal for" a disclosure that was made during the normal course of duties and not just "because" of that disclosure. 5 U.S.C. § 2302(f)(2). In adding this additional burden, Congress was distinguishing between employees who have a general obligation to report wrongdoing and those employees whose very job involves investigating such as auditors and investigators. See, e.g., S. Rep. No. 112-155 at 5. I find that the appellant as an Aviation Safety Inspector responsible for ensuring compliance with the FARs falls under this provision.

(ID, p.14, Appx. 3).

### C.  The 2016 AJ Alternative Conclusion of Lack of Reasonable Belief:

Alternatively, the AJ found that even without the § 2302(f)(2) jurisdictional disqualification, Farrington's May 2003 disclosures both to regional officials far above her and the NTSB that AirTran was violating safety regulations and jeopardizing passenger safety connected to emergency exit training for flight crews

were not objectively reasonable. Conflating her disclosures about regulatory violations, specific dangers to public safety, and inadequate funding to regulate the airline, the AJ dismissed them all as unprotected:

> While the appellant also argues that her May 2003 report discloses violations of the FAR, the report contains no specific citations to the FAR, does not explain how the appellant believes the FAR is being violated and briefly *states that regulatory requirements are not being met* without elaboration. A disclosure must be specific and detailed, not a broad-brush accusation that amounts only to a vague allegation of wrongdoing. *Rzucidlo v. Department of the Army*, 101 M.S.P.R. 616, ¶ 13 (2006); *Gryder v. Department of Transportation*, 100 M.S.P.R. 564, ¶ 13 (2005). At best, the appellant's May 2003 report amounts to a vague allegation of wrongdoing on the part of AirTran and I find that the May 2003 report is *not entitled to protection on the grounds that it disclosed a violation of law, rule or regulation*. The appellant also alleges that her May 2003 report *disclosed substantial and specific danger to public safety*.
>
> The inquiry into whether a disclosure is sufficiently "substantial and specific" to be protected under the WPA is determined by evaluating several factors, including (1) the likelihood of harm resulting from the danger; (2) when the alleged harm may occur; and (3) the nature of the harm, i.e., the potential consequences. *Chambers v. Department of the Interior*, 602 F.3d 1370, 1376 (Fed. Cir. 2010). General criticism by an employee that an agency is not doing enough is not protected. Id. at 1368-69. The appellant's *disclosure of inadequate funding for surveillance* does not rise to the level of creating a specific and substantial danger to public safety because *a reasonable person with the facts objectively known to the appellant could not have believed that she could not adequately perform her surveillance duties for AirTran*.

(ID, p. 20, Appx 3, emphasis added).

11

**D.** **The 2023 Board Affirms the 2016 AJ Conclusions on Normal Duties/Normal Channels and Lack of Reasonable Belief:**

The March 15, 2023, final order attempted to cure the failure by the AJ to make explicit findings and conclusions as to which of Farrington's disclosures were made during the normal course of her duties and through normal channels:

> The administrative judge found that the appellant, as an Aviation Safety Inspector who was responsible for ensuring compliance with Federal Aviation Administration regulations and investigating and reporting wrongdoing, was covered by 5 U.S.C. § 2302(f)(2). The administrative judge, in analyzing the "extra proof requirement" regarding each personnel action, *appears to have implicitly found that each of the appellant's four disclosures were made during the normal course of her duties*. On review, the appellant contends that the case is governed by the Board's earlier [2012] decision, and its finding that "there was no duty speech." *We supplement the initial decision to explicitly find that the appellant made her disclosures in the normal course of her duties.*

(March 15, 2023, final order, pp. 4-5 ¶6 , Appx. 1, internal case and record citations omitted) (emphasis added). The Board did not just make that "supplement", but used the internet to introduce whole cloth in the record that the NTSB does independent investigations and therefore any information that she provided to the NTSB in any form or through any channel was pursuant to her normal job duties, which included her witness interview and her May 2003 written disclosure:

> In its earlier decision, the Board relied on the appellant's position description and concluded that she failed to make a nonfrivolous allegation that her disclosures to the National Transportation Safety Board (NTSB) were not made within her normal job duties within the normal channels of reporting. The appellant's position description

stated that, as part of her surveillance duties and responsibilities, she is expected to "conduct investigations of . . . aircraft incidents and accidents" and to "[p]articipate[] in cabin safety related incident/accident investigations of air carriers and air operators." *The NTSB is an independent Federal agency charged with "investigating every civil aviation accident in the United States," it determines the probable cause of accidents, and it issues safety recommendations aimed at preventing future accidents. National Transportation Safety Board, About the NTSB, https://www.ntsb.gov/about/pages/default.aspx (last visited Mar. 14, 2023).* The appellant provided the head of the NTSB Survival Factors Group with a copy of her May 2003 written report and she was interviewed by the NTSB Survival Factors Group *after the NTSB initiated its investigation into the March 26, 2003 AirTran inciden*t. Based on these facts, *we supplement the initial decision to find explicitly that the appellant's two disclosures to the NTSB were made within the normal course of her duties*.

(March 15, 2023, final order, p. 5 ¶7, internal citations omitted). (Emphasis added).

Farrington had never before had any communications with the NTSB about anything. The NTSB is not mentioned in her job description or any performance appraisal.

**E.  Failure to Prove Reprisal:**

The Board held that even assuming the appellant proved she disclosed a violation of law, rule, or regulation and/or a substantial and specific danger to public health and safety pursuant to 5 U.S.C. § 2302(b)(8)(A), the administrative judge correctly concluded she failed to prove "the agency took the personnel actions against her in reprisal for her disclosures". Because the Board affirmed the administrative judge's finding on reprisal, it held "we need not address the

appellant's arguments on review concerning contributing factor or whether the agency proved by clear and convincing evidence that it would have taken the action(s) at issue absent the disclosures."  (Id. at ¶12).

## IV.   STATEMENT OF RELEVANT FACTS

For purposes of this Petition for Review only, Farrington will not contest any fact finding on pure issues of fact has been made by the administrative judge or the Board without substantial evidence.  Instead, she will contest only the application of the law to facts, and ultimate fact findings that are mixed issues of law and fact.  For example, Farrington will not accept purported "findings of fact" that she engaged in no protected activity, or characterizing her "normal" duties and channels within the meaning of the WPEA, or her objectively reasonable belief in regulatory violations or safety standards, or whether she established Board jurisdiction under the WPEA.

**Facts from Initial Decision**: The following are findings of fact or mixed fact and law findings and conclusions made by the administrative judge in her June 1, 2016, initial decision.

### A.   **Background of Employment Relationship:**

1.  Kim Farrington was employed by the FAA as an Aviation Safety Inspector (Cabin Safety) from 1997 until 2004 insuring flight attendant training was adequate to protect the flying public. She was based in a small FAA outpost in

Orlando, Florida called the "AirTran CMO", which is short for the "AirTran Certificate Management Office".   She was assigned only to flight attendant review of that single airline, AirTran Airways.  The AirTran CMO was dedicated to the surveillance and regulation of AirTran Airways.

2.  At the AirTran CMO, Farrington worked directly for the Principal Operations Inspector ("POI") Martin Polomski. The CMO Manager was Jack Moyers, and his Assistant Manager, Vickie Stahlberg. Polomski at the times relevant to this action was Farrington's first-line supervisor, and he was responsible for "anything related to the operation of the [AirTrans] airplanes" operating out of Orlando, from refueling to ticketing. The appellant spent significant time assisting AirTran with improving their flight attendant training program including traveling to Atlanta on two occasions to observe month long initial flight attendant training sessions. (2016 ID, pp. 1-2, Appx. 3)

**B.  Farrington's Regularly Assigned Duties and Communication Channels:**

3.  The AirTran CMO safety inspectors were divided into two branches: operations and maintenance. The appellant was employed by the agency with the title of "Aviation Safety Inspector (Cabin Safety)" from 1997 until 2004.   She had no "normal responsibility" for any aspect of aviation accident investigations. (2016 ID, pp. 2-3, Appx. 3).  Her normal communication channels were direct chain of command at the Orlando MCO.  The AJ made no findings that Farrington had any

regular, periodic or recurring reporting or communications channels outside of the MCO.

4. In ensuring AirTran flight attendants knew what they were doing, her normal and specific responsibilities were "to provide technical support to the general public, to observe airline activity for regulatory compliance, to observe the training of flight instructors, to monitor boarding of flights at gate to ensure oversized bags were not allowed, to review airline manuals and publications for compliance with FAA regulations and to observe initial and recurrent training of flight attendants to ensure that it was properly conducted." (2016 ID, pp. 1-2, Appx. 3)

**C.** **Farrington was Recognized for Her Regulatory Knowledge and Safety Advocacy:**

5. As a result of her efforts before her protected activity, Farrington received several awards from the FAA and a letter of praise from AirTran. She was repeatedly praised for her knowledge in advancing flight attendant training. On February 10, 2003, the appellant was presented with a "Superior Efforts Award" by Mr. Moyers in recognition of the improvement in flight attendant training at AirTran as a result of her efforts. (2016 ID, pp. 3-4, Appx. 3).

6. Moyers and an AirTran training officials had praised Farrington, and "characterized the training program as second to none as a result of her efforts." In his affidavit filed in support of the appellant in this appeal, the official, Mr.

Clements, attested that Farrington was "instrumental in assisting AirTran with compliance and training" and "spent many hours reviewing policies and training curriculum development resulting in marking improvement in the quality and standards of cabin attendant candidates." (2016 ID, p.31, Appx. 3).

### D. The AirTran Parallel FAA and NTSB Accident Investigations:

7.  On March 26, 2003, AirTran Flight 356 travelling from Atlanta's Hartsfield International Airport to New York's LaGuardia Airport made an emergency landing and evacuation at LaGuardia Airport due to smoke in the aircraft. During the evacuation, the flight attendants had some difficulty deploying the aircraft's tail cone emergency exit slide and several passengers were injured, including one seriously. The NTSB opened an investigation by a group known as the Survival Factors Group which had airline, union and FAA representatives. Farrington was never a member of that Group and other than a single interview, had no involvement with it until she sent the NTSB her May 2003 disclosure about the FAA's failure to regulate AirTran safety. (2016 ID, p. 4, Appx. 3).

8.  The NTSB investigation focused, in part, on AirTran flight attendant training and the appellant was interviewed due to her responsibilities for overseeing cabin safety and flight attendant issues. Other agency employees were also interviewed. Farrington was not contacted by the NTSB, but was instead notified by Moyers that the NTSB "wanted to talk to her about flight attendant

issues" related to the accident at some point in April of 2003. Commercial aviation accidents by air carriers are exceedingly rare in the United States, so Farrington's job duties could include participating in an accident investigation of air carriers if one ever occurred that involved flight attendant training.  But AirTran Flight 356 was the only air carrier accident in her FAA career.  (2016 ID, p. 5, Appx. 3).

9.   Independently of the NTSB, the agency had also begun conducting its own parallel investigation of the AirTran Flight 356 accident. On May 6, 2003, Farrington's POI Polomski informed AirTran that due to the problems with the manual operation of the tail cone exit slide during Flight 356's evacuation, the agency was conducting an investigation to discover the "active and latent organizational failures associated with this event."  The appellant had no communication with, nor was she interviewed by, the NTSB until May 22, 2003. Thus, by the time of her first NTSB contact, Farrington had been pressing these "active and latent organizational failures".  She was not vaguely speculating about them. As part of the agency review of AirTran's Flight Attendant Training Center, Farrington had concluded that "both flight attendant instructors and flight attendants did not know the applicable procedures for manual slide deployment in the event the automatic system fails." (2016 ID, p. 5, Appx. 3).

### E.   **Protected Disclosures to FAA and NTSB in May 2003:**

10.  In May 2003, Farrington wrote an 11-page report detailing complaints she had about the functioning of the agency in its AirTran oversight.10 IAF, Tab 19, Subtab F. The appellant sent a copy of her May 2003 disclosure to Fred Walker, Division Manager for FSDO (her first protected disclosure). On May 21, 2003, "[r]egarding the safety issues raised by the appellant, [the FSDO] stated that the agency had empaneled a team of impartial specialists from outside of the appellant's work area to look into the issues she had raised."  Concerned that Farrington was going to impugn the lax safety practices of the CMO, on May 16, 2003, Moyers sent an email to Walker titled "Heads Up Hostile Work Environment claim" minimizing her disclosure as simply being a matter of her being "upset at him." Thus, Walker himself, not just his staff, had received Farrington's "May 2003 Report sometime after May 16, 2003".  (2016 ID, p. 6, Appx. 3).

11.  Less than 30 days later,  on June 17, 2003, Walker "*visited* the AirTran CMO to meet with all employees".   After the all-employee meeting, Farrington met alone with Moyers.  "It was not unusual for Mr. Walker to meet with employees after his meeting" and he claimed that during these periodic *visits* to Orlando he "would routinely meet with Aviation Safety Inspectors to discuss safety issues". (2016 ID, p. 7, Appx. 3).  That is, he periodically "visited" the MCO, and during these periodic visits, he "routinely" talked to inspectors.

**F.** **Walker Gags Farrington from AirTran Regulatory Communications:**

12.  It turned out that Moyer was not the only one concerned with Farrington's disclosure about poor AirTran oversight.  In a stunning and unexplained coincidence of timing, on the day Walker arrived on June 17, 2003, Klaus Goersch, Vice President of Flight Operations at AirTran, wrote to Mr. Walker complaining about the appellant and requesting that she be removed from oversight of AirTran." Goersch's letter accused the appellant "of attempting to force AirTran to change things to meet her personal preference without any regard for regulatory substance or support."  Obviously not knowing the FAA had been giving her awards for her knowledge and dedication, the AirTrans executive lambasted "Farrington's lack of knowledge of the FARs" and for erecting "unnecessary obstacles "  In the midst of the NTSB and FAA parallel investigation of the AirTran operational failure leading to a bungled and life threatening evacuation, Goersch's letter accused Farrington of "interrupt[ing] senior members of the [AirTran inhouse] training and standards organization" with guidance contrary "to AirTran policy and the proper content of the FAA accepted Flight Attendant Manual."  (2016 ID, p. 7, Appx. 3). According to Moyers, "he was not surprised to see the letter because POI Polomski had previously told him that AirTran was not happy with the appellant's performance and that they were considering writing a letter."

13.   The FAA acted swiftly with the NTSB investigation still pending to
honor AirTrans demands to rid itself of the whistleblower.  On July 11, 2003,
Walker's staff formally counselled Farrington about upsetting AirTran
management.  Jim Ellison, a high-level Labor Relations official from the Southern
Region in Atlanta, and Farrington was officially gagged and forbidden from
carrying out her duties directly with AirTrans, ordering her to clear any
communications with airline with her supervisors. Once stripped of her normal
duties, on September 15, 2003, Walker said that although Farrington had proven
herself to be "a knowledgeable inspector" she was being removed from direct
communications with AirTrans so she could "learn to work in a more collaborative
fashion." (2016 ID, pp. 7-8, Appx. 3).  Moyers admitted that carrier could push
back on being regulated and that "during the previous two years, AirTran had
raised issues relating to the appellant's conduct during training surveillance."  The
AJ made no findings as to why action was only being taken against Farrington
within temporal proximity to her disclosures to high levels of the FAA and the
NTSB.

14.   Farrington testified that during the counselling, Ellison told her that
"here's the deal, you are being placed on an employee counseling moratorium that
will last for 6 days, 6 weeks, 6 months, or 6 years, you are not to communicate
with the carrier." The AJ found that "Mr. Ellison did not specifically deny telling

the appellant she could be on the moratorium for 6 days or 6 weeks or 6 years but he denied telling her she would be removed." (2016 ID, p. 35, Appx. 3).

### G. **FAA's Deliberate Infliction of Mental Distress on Farrington:**

15.  Within two weeks, Farrington was out on psychiatric leave. On July 24, 2003, the appellant stopped reporting for work due to a medical condition and never returned to the Orlando CMO. On January 20, 2004, Moyers received a follow-up letter from her psychiatrist, indicating that she could not return to duty until at least March 1, 2004.  On February 4, 2004, the psychiatrist informed the agency that been Farrington was suffering from a work-related Adjustment Disorder with anxious and depressed mood., and indicated she could return to work in a duty station other than Orlando and recommended a transfer.  On August 11, 2004, Moyers proposed the appellant's removal based on her continued unavailability for full-time duty. The appellant's removal was effective October 3, 2004.  She did not file a direct appeal, instead on April 17, 2009, filing an IRA. (2016 ID, pp. 9-10, Appx. 3).

### H. **Farrington's Reasonable Belief in AirTran and FAA Regulatory and Safety Failures:**

16.  In concluding that Farrington could not have had a reasonable belief that AirTrans had put the flying public in danger and was not complying the FAR's for training flight attendants by not having an actual mock-up emergency exit in its

training curriculum, the AJ cited after-the-fact NTSB and FAA investigation

findings:

> During the emergency evacuation, the flight attendant tasked with opening the tail cone door was unable to get the emergency evacuation slide to fully inflate after opening the door. The appellant testified at the hearing that the flight attendant responsible for opening the tail cone door did not know how to operate it and could not get the tail cone door open. *This testimony is contrary to the findings in the NTSB report,* however, that found the flight attendant opened the tail cone door but had problems getting the slide to manually inflate after it did not do so automatically upon opening of the tail cone door.

(2016 ID, p.21, n. 33, Appx. 3).  (Emphasis added).

17.  The AJ found that Farrington told the Survival Factors Group that the

AirTran training program was 'in compliance' with the FARs but that "she thought

that there might be occasions when the training was not conducted in compliance

with the training program."  The appellant "believed that the regulations required

all flight attendants to operate all exits on all aircraft in all modes, and that the

AirTran flight attendants would not be in compliance with the FAR unless they

completed hands on training on a B-717 tail cone mockup."  From this distinction

over whether AirTran was directly violating an FAR or indirectly doing so by not

being able to accomplish an error-free evacuation in accordance with AirTran's

training manual, the AJ concluded she could not reasonably believe there were any

FAR violations because her "statement to the NTSB that AirTran was in

compliance with the FARs directly contradicts her hearing testimony, where she

testified that AirTran had been deficient with respect to the FAR for 3 ½ years."

(2016 ID, p.22, n. 34-35, Appx. 3).

18. Unlike the AJ, POI Polomski did not find Farrington's positions to be unreasonable. He testified that:

> "[T]he NTSB investigation discovered that the tail cone cover that protected the emergency slide pack used to AirTran's mockup did not correctly replicate what was actually on the airplane. *He and the appellant disagreed about what training needed to be done to fix this.* The appellant believed all of the flight attendants needed to be taken off-line and given hands on training immediately between the two slide pack covers, which would have AirTran informing them that they needed to modify their tail cone mockup to replicate the B-717 aircraft. *** *While Mr. Polomski agreed that additional training was needed, he disagreed with the appellant over how it should be done.*

(2016 ID, pp.23-24,  Appx. 3). (Emphasis added).

**Facts from 2023 Final Order**:  The following are fact findings or mixed findings of fact and law set forth in the Board's March 15, 2023, Final Order of Dismissal.

1. The appellant's position description stated that, as part of her surveillance duties and responsibilities, she is expected to "conduct investigations of . . . aircraft incidents and accidents" and to "participate in cabin safety related incident/accident investigations of air carriers and air operators." (March 15, 2023, Final Order, ¶7, Appx. 1).

2.  The NTSB is an independent Federal agency charged with "investigating every civil aviation accident in the United States," it determines the probable cause of accidents, and it issues safety recommendations aimed at preventing future accidents. (Id.)

3.  The appellant's position description stated that she would have "frequent contact" with, among other groups, "field and regional office management" and that the "purpose of these contacts is to . . . provide feedback, communicate findings, or resolve issues and problems." The Division Manager was the appellant's fourth- or fifth-level supervisor. (Id. at ¶9).

4. The information Appellant disclosed in her May 2003 written report and subsequent meeting with the Division Manager was information that she learned during the normal course of her duties. (Id.)

5.  The Division Manager had an "open door policy," but Farrington was never told that she had a duty to provide the Division Manager with the written report or speak to him.   She never spoke to the Division Manager prior to sending him the May 2003 report and she had never gone to him on a work-related issue. (Id.)

6.   When there was a disagreement at the local level about an issue, the issue was elevated, and it was common for Aviation Safety Inspectors to work through local managers or to raise directly issues to the regional level. (Id.)

7. Concerning the May 2003 written report, Farrington had attempted to pursue her disclosures therein through her normal supervisory channels. (Id. at ¶10).

8. Appellant provided her May 2023 report to someone in her chain of command. (Id.)

9. Concerning the June 17, 2003, meeting, the Division Manager's handwritten notes from this meeting included references to, among other things, "no crew members trained hands on" with an arrow and the citation "121.417." (Id. at ¶11). The regulation at 14 C.F.R. § 121.417 discusses crewmember emergency training. (Id. at n. 4).

10. The appellant's conversation with the Division Manager occurred in the workplace. The content of their conversation focused on work-related issues. Her position description contemplates such communications with field and regional office managers. (Id.)

11. The appellant reported to the Division Manager that her findings and recommendations were not being addressed, that flight attendants had not been trained on the proper tail cone exit, and that passengers were at risk.

12. All of Farrington's concerns were based on information that she learned as an Aviation Safety Inspector. (Id. at ¶11).

## V.  SUMMARY OF THE ARGUMENT

Farrington, a former FAA employee, disclosed information related to aviation safety to the National Transportation Safety Board (NTSB) and her FAA division manager. These disclosures are protected under the WPEA.  The Board erred in failing to apply the broad protections provided by the WPEA, which shields federal employees from retaliation for disclosing information they reasonably believe evidence violations of law, gross mismanagement, waste of funds, abuse of authority, or a substantial danger to public health or safety.  Instead, the Board applied the most restrictive interpretations of the statute.

Ten years after the WPEA legislatively overruled the restrictive "ordinary job duties" and "normal channels" of disclosure, the Board clings to the old rules. It failed to apprehend that the WPEA does not limit protection based on the disclosure channel used by the whistleblower. Instead, Sections § 2302(f)(1)(A), (D), and (E) protect disclosures made through any channel, including direct communication to a supervisor, oral channels, and off-duty disclosures through unofficial channels.  Section 2302(f)(2) does not directly reference channels but is focused on two characteristics: the job duties of the disclosing employee and the substantive content of the disclosure. Albeit under a heightened proof standard, that section protects whistleblowers who regularly investigate and disclose wrongdoing, regardless of the communication channel used.  The Board erred in

holding that Ms. Farrington's disclosures were all restricted to the lesser Section 2302(f)(2) protections.

There are no exceptions or reduced protections for external channel disclosures under the WPEA. The WPEA specifically mandates the creation of official channels for certain types of disclosures.  The congressional intent behind the WPEA emphasizes that the statute is designed to ensure that employees would not face retaliation for disclosing misconduct or abuses of authority regardless of their regular job responsibilities and normal reporting channels. Ms. Farrington's NTSB disclosures were transmitted through an independent and external channel and therefore were not subject to diminished protections. The NTSB is an independent federal agency.

Finally, Farrington's belief in FAA and AirTrans regulatory and safety violations were objectively reasonable.  Her job did not entail regularly investigating and disclosing to the Atlanta Regional Office "wrongdoing" by FAA employees at Orlando MCO. The Board erred in finding otherwise.

## ARGUMENT

## VI.   STANDARD OF REVIEW

Congress established the standards for review at 5 U.S.C. § 7703(c) as follows:

> [T]he court shall review the record and hold unlawful and set aside any agency action, findings, or conclusions found to be—

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) obtained without procedures required by law, rule, or regulation having been followed; or

(3) unsupported by substantial evidence[.]

The Federal Circuit reviews the Board's determinations of law for correctness without deference to the Board's decision. *McEntee v. MSPB*, 404 F.3d 1320, 1325 (Fed. Cir. 2005).

(3) The standard of review in this Court is de novo from the Board's orders based on applications of law. In particular, this Court reviews determinations of the MSPB's jurisdiction de novo as to questions of law, and underlying factual findings for substantial evidence. *Parrott v. Merit Sys. Prot. Bd*., 519 F.3d 1328, 1334 (Fed.Cir. 2008). There are no disputed facts in this case, only application of the law to record and jurisdictional facts. Jurisdictional facts are reviewed *de novo* as well. *Crowell v. Benson*, 285 U.S. 22, 52 S. Ct. 285, 76 L. Ed. 598 (1932) (requiring de novo judicial review of agency determinations of jurisdictional fact).

## VII.  SUMMARY OF THE BOARD'S ORDER FINDING FARRINGTON UNPROTECTED UNDER THE WPEA

The Board's order finding that Farrington is unprotected by the WPEA is based on the following findings and conclusions under 5 U.S.C. § 2302(f)(2) of the Whistleblower Protection Enhancement Act of 2012 (WPEA):

(1) Farrington's disclosures were made in the normal course of her duties as an Aviation Safety Inspector.  5 U.S.C. § 2302(f)(2) provides:

> *If a disclosure is made during the normal course of duties of an employee, the principal job function of whom is to regularly investigate and disclose wrongdoing* (referred to in this paragraph as the "disclosing employee"), the disclosure shall not be excluded from subsection (b)(8) *if the disclosing employee demonstrates* that an employee who has the authority to take*** any personnel action *** took *** a personnel action *** *in reprisal for the disclosure* made by the disclosing employee.

(Emphasis added).

(2) 5 U.S.C. § 2302(f)(2) therefore applies to deny her the protections afforded by 5 U.S.C. § 1221(e)(1) ("contributing factor") and § 1221(e)(2) "clear and convincing evidence" with that undemanding burden of proof framework.

(3) Under the heightened framework § 2302(f)(2), Farrington failed to prove the agency took personnel actions against her "in reprisal for the disclosure[s] made by" her.

The Board does not cite any Federal Circuit cases for the proper application of 5 U.S.C. § 2302(f)(2), given that even as of September 2023, there are no such cases, but only a single passing reference in *Heath v. Dep't of the Army*, 640 F. App'x 989, 990 (Fed. Cir. 2016) ("Whistleblower Protection Enhancement Act clarified that disclosures made in the normal course of one's duties may qualify as protected disclosures. *See* 5 U.S.C. § 2302(f)(2)".)  The review of Farrington's case

by the Federal Circuit will be on a largely blank slate of § 2302(f)(2)

jurisprudence.

Although there is no Federal Circuit application of § 2302(f)(2), other courts

have applied it.  Under 5 U.S.C § 2302(f)(2), "disclosures made during the normal

course of duties was contingent on whether an employee could prove that the

officials responsible for the personnel action at issue acted with an improper

'retaliatory motive'—that is, a heightened burden that is not required when a

whistleblower makes a disclosure *outside* the normal course of his duties.  *Acha v.*

*Dep't of Agric.*, 841 F.3d 878, 882 (10th Cir. 2016) (original emphasis). "The 2012

WPA amendment clarified that an employee is not excluded from whistleblower

protection simply because her 'disclosure is made during the normal course of

duties.' 5 U.S.C. § 2302(f)(2). With the 2012 amendment to the WPA, 'Congress

made crystal clear its intent that *any* whistleblower who reports misconduct via one

of the enumerated channels be protected'." *Leshinsky v.* Telvent GIT, S.A., 942 F.

Supp. 2d 432, 449 (S.D.N.Y. 2013) (emphasis in original).  *Taft v. Agric. Bank of*

*China Ltd.*, 156 F. Supp. 3d 407, 414-15 (S.D.N.Y. 2016).  "The WPEA amended

the WPA to include 5 U.S.C. § 2302(f)(2), which states that when 'a disclosure is

made during the normal course of duties of an employee', as here, any adverse

personnel action must, to qualify as retaliatory, be 'in reprisal' for the disclosure—

not just because of it. *** Because the Court finds that [the employee] fails to

31

'establish the lesser standard of proving contribution to the decision to remove her, she by definition, fails to prove the greater standard of retaliatory motive'." *Iglesias v. United States Agency for Int'l Dev.*, Civil Action No. 17-285 (JDB), 2018 U.S. Dist. LEXIS 175806, at *27 n.14 (D.D.C. Oct. 12, 2018).

## VIII.   THE BOARD ERRED AS A MATTER OF LAW IN FAILING TO PROPERLY APPLY THE WPEA 2012 AMENDMENTS LEGISLATIVELY OVERRULING THE COURT'S DUTY SPEECH RESTRICTIONS

Petitioner challenges the Board's decision and the interpretation of 5 U.S.C. § 2302(f)(2) based on the following arguments.

### A.   <u>Distinguishing Constitutional from Statutory Claims:</u>

The "duty speech" doctrine, as exemplified in *Garcetti v. Ceballos* (2006), should be distinguished from statutory whistleblower claims.  Public employees have First Amendment rights when speaking as citizens about matters of public concern.  When a civil servant discloses wrongdoing, she is not compelled to disclose as part of her normal job duties or outside of her normal reporting channels, then her speech enjoys the same protection as made by a citizen. The crucial factor is not the location or subject matter of the disclosure but whether it was made strictly pursuant to an employee's professional duties. The *Garcetti* majority specifically invoked the Whistleblower Protection Act pf 1989 and state whistleblower protections laws in its discussion:

> Exposing governmental inefficiency and misconduct is a matter of considerable significance. As the Court noted in *Connick*, public employers should, "as a matter of good judgment," be "receptive to constructive criticism offered by their employees." The *dictates of sound judgment are reinforced by the powerful network of legislative enactments*--such as whistle-blower protection laws and labor codes--available to those who seek to expose wrongdoing. See, e.g., 5 U.S.C. § 2302(b)(8) ***.

*Garcetti v. Ceballos*, at 425. (Emphasis added, internal citations omitted.) "Sound judgment" counsels the court to afford Farrington at least as much protection as the *Garcetti* and its progeny provide, and 5 U.S.C. § 2302(f)(2) should be construed in light of that First Amendment jurisprudence.

### B.  Congress's Intention to Restrict Agency "Duty Speech" Defense:

In enacting 5 U.S.C. § 2302(f)(2) of the Whistleblower Protection Enhancement Act of 2012 (WPEA), Congress sought to severely limit the effect of court decisions that narrowed the scope of protected disclosures, citing *Willis v. Dep't of Agric.*, 141 F.3d 1139, 1144 (Fed. Cir. 1998) (no protection under 5 U.S.C. §§ 1221(e)(1) and 2302(b)(8) (1994) if employee "did no more than carry out his required everyday job responsibilities"), citing *Horton v. Department of Transp.*, 66 F.3d 279, 282 (Fed. Cir. 1995), and distinguishing *Marano v. Department of Justice*, 2 F.3d 1137, 1139 (Fed. Cir. 1993).  Section 2302(f)(2) of the WPEA aimed to reverse such restrictive decisions, not to simply water them down. Congress's intent was to provide protection to a broader range of disclosures, contrary to the "duty speech" defense.

### C.  <u>Importance of Employee Duties Actually Performed:</u>

An employee's protection under 5 U.S.C. § 2302(f)(2) should not be determined solely by their position description but by evidence of the duties they actually perform on a regular basis. The standard of review of a written job description should be narrowly construed, not broadly cast since § 2302(f)(2) was enacted to restrict not broaden the potential harms of the duty speech defense.  The agency writes the job description and they should be strictly construed against the agency. Judicial experience teaches that normal job descriptions often do not reflect an employee's true job duties, and the content of an employee's speech, and hence the benefit to the public and airline passengers, should not be limited by these descriptions.  The Board's application of § 2302(f)(2) to the Farrington case should carefully scrutinized *de novo* in view of the Congressional purpose of protecting whistleblowers to ensure they can report wrongdoing without fear of retaliation, and hence aligning § 2302(f)(2) with statutory principles of transparency and accountability within government agencies.

## IX.  THE BOARD ERRED AS A MATTER OF LAW IN FAILING TO PROTECT FARRINGTON'S USE OF  WPEA DISCLOSURE CHANNELS

### A.  <u>The WPEA Protects all Disclosure Channels:</u>

Under the WPEA, a "disclosure" is a "*communication or transmission*" of information. 5 U.S.C.S. § 2302(a)(2)(D). All communications and transmissions of disclosures are made through "channels" between those who send and those who

receive the disclosures by oral or written means whether in person, by electronic message transmission or telecommunications. All disclosures put into these channels are protected based solely on their *substantive content* as to "any violation of any law, rule, or regulation; or gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety". All communications or transmissions of such substantive content sent through the channel are fully protected so long as the whistleblower "reasonably believed" that content.

Meriam-Webster Dictionary (online) defines "transmit" as to send or convey from one person or place to another, and "transmission" as something that is transmitted (e.g., message).  That dictionary defines "communication" as a process by which information is exchanged between individuals, such as a verbal or written message (e.g., captain received an important *communication*).  It defines "channel"  as a means of communication or expression, such as a fixed or official course of communication (e.g., went through established military *channels* with his grievances). Finally, "wrongdoing" is defined as an evil or improper behavior or action (e.g., cleared of any *wrongdoing), or* an instance of doing wrong.

In enacting the WPEA in 2012, 5 U.S.C. § 2302(f)(1) and (2), Congress foreclosed the Board from denying full protection based upon the disclosure channel selected by a whistleblower. § 2302(f)(1) and (2) do not directly reference

disclosure "channels", but § 2302(f)(1)(A), (D) and (E) do so indirectly within the prohibition that utilization of particular channel cannot be used as grounds to exclude covered disclosure from the blanket § 2302(b)(8) protection--, i.e., "any disclosure".  § 2302(f)(1)(A) protects disclosures made through any direct channel to a supervisor; § 2302(f)(1)(D) protects disclosures made through any oral channels whether by means of face-to-face, by phone or voice mail transmission; and § 2302(f)(1)(E) protects off-duty disclosures through unofficial channels such as transmissions made from home.

### B.  Protection under Section 2302(f)(2) is not Channel Dependent:

By contrast, § 2302(f)(2) makes no direct or indirect reference to channels, but is concerned exclusively with two characteristics of the disclosure:  (1) the job duties of the "disclosing employee", and (2) the substantive content sent through the channel.  § 2302(f)(2)'s transmitter protection is for a "disclosing employee" "during the normal course of [her] duties" must both "regularly investigate *and* disclose" information; and § 2302(f)(2)'s substantive protection is that the disclosure must directly transmit information about "wrongdoing".  § 2302(f)(2) contains the only usage of the term "wrongdoing" in the WPEA.  Whistleblowers whose job is *not* to "regularly investigate and disclose*** wrongdoing" are fully protected even if they communicate or transmit information they obtain during

their normal duties and through normal channels.  The WPEA explicitly overruled case precedent to the contrary.

An employee who only irregularly or occasionally investigates and discloses information about wrongdoing is fully protected; as is the employee who regularly investigates, but only occasionally discloses; or the employee who only occasionally investigates but regularly discloses.  And an employee is fully protected who regularly investigates and discloses an agency's law violations or wasteful or dangerous or incompetent practices *not attributed to a wrongdoer* but instead to the state of operations of the agency, or its history of failure to reform or correct its deficiencies, no matter how well known and complained about those deficiencies may be. § 2302(f)(1)(B) and (G) respectively protect the employee even when the "disclosure revealed information that had been previously disclosed", and no matter how stale the disclosure is based on the "amount of time which has passed" since the agency's deficiencies manifested. Still, where an agency has the authority to create a special disclosure channel for certain kinds of communications or transmissions, an employee can "be disciplined for failing to adhere to applicable agency regulations requiring them to report misconduct through agency procedures *in addition to* their whistleblower disclosures through other channels." *Losada v. DOD*, 601 F. App'x 940, 943 (Fed. Cir. 2015)

(discipline proper where whistleblower failed to "disclose the suspected child abuse via the proper channels, rather than [only] the email to OSC").

### C. There Are No Exceptions or Reduced Protections for External Channel Disclosures:

Unlike European whistleblower protection laws that require the creation, maintenance, auditing and protection of internal, external and public (media and NGOs) channels, American whistleblower law does not mandate creation and maintenance of particular internal or public channels, so long as a workable communication and transmission channel exists within each agency. But the law is different for external channels which are specifically mandated by statute and regulation, and which therefore must be protected by the agency administering the channel. Almost all federal whistleblower statutes mandate agencies, bureaus and commissions to create official channels to receive disclosures. Under the WPEA, the Office of Special Counsel is mandated to create channels to receive and process disclosures from whistleblowers about fraud, gross waste or mismanagement, abuse of authority, imminent safety danger and violation of law. And under the myriad of federal statutes protecting aviation, nuclear, transportation, health insurance, pipeline, product safety, food adulteration, securities and financial sector whistleblowers, the Department of Labor, Department of Energy, Consumer Financial Protection Bureau, Commodities Future Trading Commission and SEC are required to operate reporting channels, in addition to the OIGs of every federal

agency.  All governmental external channels are mandated to operate in accordance with published rules and regulations.

Congressional committees in 1994 criticized the Board for continuing to take a narrow view of what constitutes a protected disclosure. *Huffman v. Office of Pers. Mgmt.*, 263 F.3d 1341, 1348 (Fed. Cir. 2001).  The House report for the 1994 amendment stated that "the most troubling precedents involve the Board's inability to understand that 'any' means 'any' [except] *** for classified information or material the release of which is specifically prohibited by statute." *Id*, quoting  S. Rep. No. 103-358, at 11 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3549, 3559. Despite the committee criticism, *Huffman* held that "reports made as part of an employee's assigned *normal job responsibilities* are not covered by the [Whistleblower Protection Act] when made *through normal channels*." *Id.* at 1344. (Emphasis added, quoted in *Layton v. MSPB*, 392 F. App'x 875, 877-78 (Fed. Cir. 2010). *Kahn v. DOJ*, 618 F.3d 1306, 1313 (Fed. Cir. 2010) summarized Huffman as holding "an employee must communicate the information either outside the scope of his normal duties or outside of normal channels to qualify as a protected disclosure." The Board and this Circuit were unequivocal that disclosures made as part of normal duties using normal channels" enjoyed no protection whatsoever because they do not meet the threshold definition of "any disclosure". See also, *Fields v. Dep't of Justice*, 452 F.3d 1297, 1305 (Fed. Cir. 2006).

Congress' criticism did not fall on deaf ears, but were denied any judicial weight because "post-enactment statements made in the legislative history of the 1994 amendment have no bearing on our determination of the legislative intent of the drafters of the 1978 and 1989 legislation." *Huffman v. Office of Pers. Mgmt.*, at 1354. Thus, the court declined to agree that a "*protected disclosure may be made as part of an employee's job duties*, may concern policy or individual misconduct, and may be oral or written and to any audience inside or outside the agency, without restriction to time, place, motive, or context." *Id*. citing 140 Cong. Rec. H29353 (daily ed. Oct. 7, 1994) (statement of Rep. McCloskey) (emphasis added). However, after *Kahn* was decided, Congress adopted the WPEA, and added § 2302(f)(1) and (2), legislatively overruling *Huffman* and its progeny, abrogating entirely the "normal channels" disqualification, and confining the "normal job responsibilities" only to employees who "regularly investigate and disclose*** wrongdoing". Even then, employees in that narrowed class are still protected, but have a heightened burden of proof to demonstrate reprisal. The WPEA also overruled *Francisco v. Office of Pers. Mgmt.*, 295 F.3d 1310, 1314

(Fed. Cir. 2002) (no protection for employee "report of information that was already publicly known").

## X. INSTEAD OF PROTECTING DISCLOSURE CHANNELS, THE BOARD AND THE AGENCY WEAKENED THEM

### A. <u>The Board Applied Channel Analysis Rejected by Congress:</u>

Conspicuously missing from 5 U.S.C. § 2302(b)(8), § 2302(f)(2) and § 1221(e) is any reference to "normal job responsibilities" or "normal channels" for disclosures. These terms of the old and legislatively overruled *Huffman* approach had appropriate place in Farrington II.  It is contrary to the WPEA to deny whistleblower protection to an employee based on the channels she used to report safety.  Nor does the WPEA withhold protections for disclosures of violations to supervisors in her chain of command. Farrington's job was *not* to "regularly investigate and disclose\*\*\* wrongdoing".  Aviation accidents are exceedingly rare, as are NTSB investigations.  That Farrington worked on a single investigation during her career cannot establish her regular participation in an NTSB investigation, much less that she herself had a duty to "regularly investigate" aviation accidents.  Furthermore, NTSB investigates accidents by airlines, and only incidentally enquires about  FAA performance.  Her job position in critiquing common carrier performance does not involve any duty to "regularly investigate and disclose\*\*\* wrongdoing" by agency officials.

The Board took a narrow interpretation of "any disclosure" under 5 U.S.C. § 2302(b)(8) by limiting its protection to disclosures not made through "normal channels" and "ordinary job duties." That interpretation restricts protection to disclosures made within "normal channels" or "ordinary job duties", a *Huffman* era restriction the WPEA overruled.  This will have a chilling effect on whistleblowing and defeat the statutory purpose, for employees who are most likely to acquire knowledge of unacceptable agency practices and official behaviors during their normal job responsibilities and communicating and transmitting that knowledge through the normal channels, will decline to transmit that knowledge.

**B.  <u>The Board Undermined the NTSB as a Protected External Disclosure Channel:</u>**

The Board failed to determine whether Farrington engaged in any protected activity, but merely assumed it for purposes of its channel analysis. Thus, paying no attention to the substantive content of her disclosures, but only to type labelling them, the Board failed to apprehend the fundamental channel analysis it needed to undertake to fulfill the WPEA Congressional purpose.  Most prominently, the Board failed to determine whether the NTSB was an internal or external channel. The Board acknowledged then ignored that the NTSB is an independent federal agency charged by Congress with investigating every civil aviation accident.  The NTSB has five Board Members, each nominated by the President and confirmed by the Senate to serve 5-year terms. The NTSB is a classic external reporting

channel, and is bound by the information gathering procedures of 49 U.S.C. Part 831, including information provided by witnesses. As such, the Board was obligated to ensure that FAA employees had full access to the NTSB as an external disclosure channel. Instead, the Board did just the opposite, and denied primary whistleblower protection to Farrington in using that external channel.

The WPEA expanded the definition of protected disclosures and intended to ensure that employees wouldn't face retaliation for bringing misconduct or abuses of authority to light. 5 U.S.C. § 2302(f)(1) and (2) are critical specially enacted amendments to the civil service good government and whistleblower protection regime. All disclosures with protected content are covered by the WPEA all of the time, irrespective of time and place. The only exception is a narrow one, which places a heightened burden of proof on whistleblowers in a limited class mandated to regularly investigate and report "wrongdoing", such as auditors, law enforcement officers, and common carrier aviation accident investigators, such as those employed by the NTSB. FAA employees who infrequently coordinate with the NTSB are not in that limited class. Farrington's primary job was confined to quality control over flight attendant training, and the only accidents for which she would have a role were those where flight attendant performance was a factor under review.

### C. **Farrington's Job Was Not to Regularly Investigate and Disclose Agency Wrongdoing to FAA Division Level Officials:**

In addition to protection of her external disclosures to the NTSB, Farrington's internal disclosures to the FAA Division Manager in Atlanta did not derive from any regular investigative duties to ferret out and disclose wrongdoing by agency employees at the Orlando MCO. The Board's steadfast determination that full WPEA protection was lost by Orlando employees who voluntarily accepted of the Division Manager's occasional open forum invitations distorts not just Section 2302(f)(1) and (2), but the unambiguous Congressional intent of the WPEA. As *Huffman* quoted the Congressional record, the Congress was adamant that a "protected disclosure may be made as part of an employee's job duties, may concern *policy or individual misconduct*, and may be oral or written and *to any audience* inside or outside the agency, *without restriction to time, place*, motive, or context." (Emphasis added).

### D. **The Board Erroneously Failed to View Reasonable Belief from Farrington's Perspective:**

The Board erred as a matter of law in failing to view objectively reasonable belief from Farrington's perspective. No witness testified that her beliefs in FAA and AirTran violations were implausible. Her POI specifically testified it was a difference of opinion. As this Court held in *Horton v. Dep't of the Navy*, 66 F.3d 279, 283 (Fed. Cir. 1995):

The statute requires only that the whistleblower had a reasonable belief that, for example, a rule or regulation had been violated, in order for the disclosure of such violations to be protected. Indeed, the Board's finding that the reported violations were "trivial" supports a reasonable belief on the part of Mr. Horton that violations in fact occurred. We take note that the evidence was mixed concerning the substance of the matters disclosed. For example, the library staff member admitted to the personal phone call that was the subject of the May 16 incident. *The Board did not review this evidence from the viewpoint of Mr. Horton's "reasonable belief,"* but instead found that this single incident could not reasonably be viewed as wrongdoing. *** Whether or not the reported violations were trivial, in the Board's view, does not deprive the discloser of the benefit of having made a protected disclosure.

(Emphasis added).  Indeed, neither the administrative judge nor the Board explained how, as a matter of law, Farrington's beliefs were not objectively reasonable. As this Court recently reiterated in *Ferrell v. HUD*, No. 2022-1487, 2023 U.S. App. LEXIS 3146, at *7-8 (Fed. Cir. Feb. 9, 2023):

A protected disclosure under the WPA and WPEA is a disclosure of information that the individual reasonably believes evidences a violation of law, rule, or regulation, gross mismanagement, gross waste of funds, abuse of authority, or substantial and specific danger to public health or safety. 5 C.F.R. § 1209.4(b). *The test to determine whether a putative whistleblower has a reasonable belief is an objective one:* could a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that the actions of the government evidence one of the categories of wrongdoing protected by the WPA and WPEA. *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999). *The reasonableness of the disclosure is based upon what the employee knew at the time of the disclosure, not whether later information may have established the reasonableness of an earlier disclosure. Reardon v. Dep't of Homeland Sec.*, 384 F. App'x 992, 994 (Fed. Cir. 2010).

Thus, subsequent findings by the NTSB can play no role, as the Board erroneously accorded the issue.

## XI.  IN ITS NEW "REPRISAL" JURISPRUDENCE, THE BOARD ATTEMPTS TO ABROGATE THE BURDEN OF PROOF REGIME LONG SINCE ESTABLISHED BY CONGRESS.

Section 2302(f)(2) provides that investigators must prove retaliation rather than a mere causal link. That only affects the ultimate conclusion whether the law has been violated, however. There is not a scintilla of statutory language, legislative history or prior precedent that paragraph (f)(2) amended the methodology or order of the parties' burdens of proof to reach the "reprisal" conclusion. The Board's decision erroneously requires whistleblowers to disprove what Congress has prescribed as the agency's burden to establish by clear and convincing evidence.  The Board has no authority to rewrite the Act's order, methodology and structure for presenting and adjudicating burdens of proof.

When it enacted the WPA, Congress codified long-standing principles to assess retaliation that were controlling even before 1989 when it modified the laxity and severity of parties' respective burdens of proof under section 2302(b)(8). Since passage of the Civil Service Reform Act, an employee has only needed to establish a retaliatory inference for a *prima facie* case. This can be proven by demonstrating protected activity and its nexus to a subsequently prohibited personnel action. The ultimate conclusion on retaliation, however, requires careful

scrutiny of the agency's purported independent basis for the action. *See, e.g.,*

*Warren v.* Dept. *Army,* 804 F.2d 654-57 (Fed. Circ. 1986). Nothing in statutory

language or legislative history of WPEA Subjection (f) modified this.

In 1989 Congress relaxed the employee's nexus burden to only require a

showing of "contributing factor" for the nexus, which it defined as: "*Any* factor,

alone or in combination with other factors, that tends to affect the out in any way."

See, 134 *Cong. Rec*. 19,981 (1988) and 135 *Cong. Rec.* 4509 (1989). See also *id.* at

4518 (statement of Sen. Grassley); at 4522 (statement of Sen. Pryor); at 5033

(explanatory statement of Senate Bill 20); and at 4522 (statement of Rep.

Schroeder). Retaliation is one way to prove nexus, but not a stated statutory

prerequisite.  This is firmly shown by the 1994 Congress' codification of the

knowledge-timing test, which the Board has held as it must is satisfied if an action

occurs within two years of lawful whistleblowing. *Boyd v. Dep't of Homeland Sec.*,

2015 MSPB LEXIS 5631, p. 10 (June 25, 2015); *Chavez v. Department of Veterans*

*Affairs*, 120 M.S.P.R. 285, p. 27 (2013); *Gonzalez v. Department of Transportation*,

109 M.S.P.R. 250, p. 20 (2008); *Schnell v. Dep't Army*, 114 M.S.P.R. 83 (2010),

2010 MSPB LEXUS 67, p. 21; *Carey v. DVA*, 93 M.S.P.R. 676 (2003); *Redschlag*

*v. Department of the Army,* 89 M.S.P.R. 589, p. 87 (2001).  Thus, temporal

proximity alone is enough, and is extremely close in Farrington's case.

In 2012 and 2017 Congress established and then narrowed a "duty speech" exception that requires the employee to demonstrate retaliation. 5 U.S.C. 2302 section (f)(2). Yet the amendments contained no modifying language of the core whistleblower protection of the contributing factor standard.  Nothing in Subsection (f) abrogates that upon the employee showing contributing factor, if only by temporal proximity, the burden then shifts to the agency to prove by clear and convincing evidence an independent basis for which it would have acted. 5 U.S.C. section 1221(e).   The procedure and substance of *Carr. v. Social Security Administration,* 185 F.3d 1318 1323 (Fed. Circ. 1999) amply makes the point. There this Court established the three factor criteria for measuring whether an agency has met its affirmative defense burden: (1) strength of the evidence of the asserted independent non-discriminatory reason for action; (2) strength of the evidence of lack of the deciding officials' motives to retaliate; and (3) evidence of discriminatory treatment compared to similarly situated employees who had not made protected disclosures. In every case where contributing factor is established no matter how tenuously, *Carr* factor (2) "motive to retaliate" or motive for reprisal must be measured through the normal burden of proof process.

Since passage of the WPEA this structure has continued to be controlling for all whistleblower appeals interpreting retaliation or reprisal: the employee has a relatively modest nexus burden for the prima facie case, and whether there has

48

been reprisal is only decided after the agency's attempt to prove non-retaliatory

reasons and motives by clear and convincing evidence. *Rutter v. DOJ* , 2018

MSPB LEXIS 500, *16-17 (M.S.P.B. February 6, 2018); Coppola v. Dep't of

Veterans Affairs, 770 F. App'x 573, 576 (Fed. Cir. 2019).  Under Subsection (f)(2),

if the professional investigator or accountant establishes contributing factor even

by temporal proximity alone as Farrington clearly does,  if the agency cannot prove

by clear and convincing evidence that it would have taken the same action for

legitimate reasons, the employee necessarily has met her burden of showing

reprisal.  The Board in this case did the exact opposite of what the statute

commands.  It held with no citation or explanation of any kind as to the burden of

proof process or standards for measuring reprisal, that administrative judges by

merely concluding in a freewheeling process that there was no reprisal, can

completely dispense with the statutorily prescribed contributing factor and clear

and convincing affirmative defense analysis.

Under the WPEA Subsection (f)(2) language, the corrected holding is that in

order for an administrative judge to make a conclusion whether reprisal has been

shown, it is the agency's burden to specifically prove non-retaliatory motives by

clear and convincing evidence.  The Board erroneously ignored the statutory

shifting burdens of proof, and required Farrington to prove the ultimate conclusion

of retaliation without  considering whether she had met the modest standards for an

inference either before or after Congress enacted the contributing factor test. To

allow the Farrington Board holding to stand, will functionally erase the core of the

statutory scheme that mandates the agency to convincingly defend its asserted

innocent motives. No authority exists that when Congress enacted section

2302(f)(2) it was cancelling the reverse burden of proof in section 1221. Section

2302(f)(2) only affects the ultimate conclusion for a WPA violation, not the

infrastructure of the parties' burdens to reach it.

## XII.  FARRINGTON HAS MET HER BURDEN TO PROVE REPRISAL

Even if the burden to prove reprisal rested solely with appellant in a

statutory vacuum, she has met it. The Board failed to define what is required to

constitute reprisal before ruling that Farrington had not proved it. The difference

between a causal link and reprisal is that the latter requires the element of

punishment, the former does not. See, *Spruill v. MSPB,* 978 F.2d 679, 681 (Fed.

Circ. 1992).  As Spruill explained at note 2:

> A note on terminology. What is at issue here is an official action,
> presumably adverse, taken against an employee, intended to be
> punishment for some protected act of the employee, such as
> whistleblowing. This official action is sometimes called 'reprisal,' and
> sometimes         called         'retaliation.'         The
> dictionary meaning of reprisal suggests  actions  taken  to  procure
> redress of grievances, or something given or paid in restitution.
> Retaliation, on the other hand, connotes repayment in kind, to
> transgress against a transgressor. Neither term quite describes what is
> going on. We use reprisal since that is the term used, though not defined,
> in the Findings and Purpose section of the WPA, see 103 Stat. 16 § 2
> (codified at 5 U.S.C. § 1201, note (Supp. II 1990)), and it has fewer

letters.

Long before the WPEA's passage, the circumstantial evidence allowances to prove

retaliation had long since been established. As the Board explained in

*Valerino v. HHS*, 7 MSPR 487, 489-90 (1981):

> Whether a causal connection exists between the alleged protected activity and appellant's removal requires consideration of various factors including: (1) the employer's reaction to the protected activity, *Miller v. Williams*, 590 F.2d 317, 320 (9th Cir. 1979); (2) the closeness of the adverse action to the protected activity, compare [*490] *Womack v. Munson*, 619 F.2d 1292 (8th Cir. 1980); *NLRB v. Automotive Controls Corp.*, 406 F.2d 221 (10th Cir. 1969) with *Williams v. Boorstin*, 23 FEP Cases 1669 (D.C. Cir. 1980), *cert. denied*, 68 L.Ed.2d 842, 25 FEP Cases 1192 (1981); *NLRB v. Walton Mfg. Co.*, 286 F.2d 26 (5th Cir. 1961); *Rogers v. McCall*, 488 F. Supp. 689 (D.D.C. 1980); (3) the extent of the charges and disclosures forming the basis of the protected activity, *Frazier*, supra, 189; (4) the seriousness of them *Id*.; and (5) the time during which the matters raised by them were left unresolved.  *Id.*

*See also Powers v. Dep't of Navy,* 69 MSPB 150, 156 (1995); *Fellhoelter v. Dep't*

*Agriculture*, 568 F. 3d 965, 971 (Fed. Circ. 2009); *Sheehan v. Dep't Navy,* 230 F.3d

1009, 1014 (2001); and *Webster v. Dep't of the Army,* 911 F.2d 689, 690 (Fed. Cir.

1990).   In *Warren v. Dep't of Army*, 804 F.2d 654, 656 (Fed. Cir. 1986), this Court

held:

> The board and counsel for petitioner agree that one adjudicating an adverse action in which a claim of illegal retaliation is made, must apply four tests which, as stated in *Hagmeyer v. United States*, 757 F.2d 1281, 1284 (Fed. Cir. 1985), are as follows:

> > In order for petitioner to prevail on his contention, [of illegal retaliation] he has the burden of showing that (1) a protected disclosure was made, (2) the accused official knew of the disclosure,

(3) retaliation resulted, and (4) there was a genuine nexus between the retaliation and petitioner's removal.

Subsection (f) using the term "reprisal" did not change this longstanding formula.

In case after case having nothing to do with that subsection, this Court has used the term "reprisal" as a fundamental element of every whistleblower's claims.

In *Rickel v. Dep't of the Navy*, 31 F.4th 1358, 1364 (Fed. Cir. 2022), the Court explained:

> 5 U.S.C. § 2302(b)(8) prohibits an agency from penalizing its employees for whistleblowing. "An employee who believes he has been subjected to illegal retaliation must prove by a preponderance of the evidence that he made a protected disclosure that contributed to the agency's action against him." *Smith v. GSA*, 930 F.3d 1359, 1365 (Fed. Cir. 2019). "If the employee establishes this *prima facie case of reprisal* for whistleblowing, the burden of persuasion shifts to the agency to show by clear and convincing evidence that it would have taken 'the same personnel action in the absence of such disclosure,' which we sometimes refer to as a showing of 'independent causation.'" *Miller v. DOJ*, 842 F.3d 1252, 1257 (Fed. Cir. 2016) (citations omitted). In determining whether the agency has carried its burden, the Board considers the three nonexclusive *Carr* factors. *See Carr*, 185 F.3d at 1323.

See also, *Coppola v. Dep't of Veterans Affairs*, 770 F. App'x 573, 576 (Fed. Cir. 2019) ("while the term 'reprisal' is commonly used in the whistle-blower context, it also relates to retaliatory action against an employee for filing an EEO complaint alleging discrimination"); *Brock v. DOT*, No. 2023-1133, 2023 U.S. App. LEXIS 24745, at *15-16 (Fed. Cir. Sep. 19, 2023) ("If the employee establishes this *prima facie case of reprisal* for whistleblowing, the burden of persuasion shifts to the

agency to show by clear and convincing evidence that it would have taken 'the same personnel action in the absence of such disclosure", quoting *Whitmore v. Dep't of Lab.*, 680 F.3d 1353, 1364 (Fed. Cir. 2012)); and *Anoruo v. VA*, No. 2023-1114, 2023 U.S. App. LEXIS 21460, at *6-7 (Fed. Cir. Aug. 16, 2023) ("If the employee establishes this *prima facie case of reprisal* for whistleblowing, the burden of persuasion shifts to the agency", quoting *Smith v. Gen. Servs. Admin.*, 930 F.3d 1359, 1365 (Fed. Cir. 2019).)

This "reprisal" test existed before and after section 2302(f)(2) was enacted. Appellant has presented voluminous evidence in the record for each of these factors, none which the Board challenged as it ignored them all. Even with the Board's erroneous legal standards, appellant has more than met her burden to prove an inference of retaliation.

## XIII.   SECTIONS 2302(F)(1) AND (2) SHOULD BE VIEWED IN A FIRST AMENDMENT DUTY SPEECH CONTEXT

The Board's holding that the Agency sustained its duty speech defense under § 2302(f)(2) is not consistent with Supreme Court decisions in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), *Lane v. Franks*, 573 U.S. 228 (2014) and *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022). While the final order contends that Farrington's disclosures were within her ordinary job duties, *Garcetti, Franks* and *Kennedy* provide a whistleblower duty speech framework that the Board did not.

## A. __Disclosures and Speech Related to Employment Duties, but not Compelled by Them are Protected Under the First Amendment and the WPEA:__

The majority opinion in *Garcetti* holds that speech made by a public employee "pursuant to their official duties" is not protected by the First Amendment. However, *Garcetti* emphasized that this determination must be made by evaluating the nature of the employee's actual job duties, not just written job descriptions. Speech made pursuant to an employee's official responsibilities is not protected, but speech on matters of public concern, even if made in the workplace, retains protection if the employee spoke as a citizen. The analog of § 2302(f)(2) to *Garcetti* is that when a federal civil servant without her job mandating it discloses wrongdoing, even about her own Agency with information she learned during her job, she essentially speaks as a citizen. An employee blowing the whistle on wrongdoing outside of her job duties does not speak as an "employee" but as a "citizen".

## B. __The Board Conflated Farrington's Work Related Knowledge with Work Mandates:__

The Board did not distinguish whether Farrington's speech was made on matters of public concern or simply a matter of public administration. Nor did the Board distinguish whether the subject matter of her speech was learned at work, or whether that speech was compelled by work. The latter is not protected, but the

former is, whether under *Garcetti* or § 2302(f)(2). *Lane v. Franks* clarified the

distinction:

> But *Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment. The *Garcetti* Court made explicit that its holding did not turn on the fact that the memo at issue "concerned the subject matter of the prosecutor's employment," because "the First Amendment protects some expressions related to the speaker's job." In other words, the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* i s *whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties*.
>
> It bears emphasis that our precedents dating back to *Pickering* have recognized that *speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment*. In *Pickering*, for example, the Court observed that "teachers are . . . the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." Most recently, in *San Diego* v. *Roe*, 543 U. S. 77, 80 (2004), the Court again observed that public employees "are uniquely qualified to comment" on "matters concerning government policies that are of interest to the public at large."

*Lane v. Franks*, 573 U.S. 228, 239-40, emphasis added, internal quotations and brackets omitted.

### C. The Board Did not Engage in the Required Rigorous Scrutiny of Asserted Job Duty Assertions by the Agency:

Farrington's disclosures raised concerns about aviation safety, passenger

safety, and compliance with regulations, all of which address matters of enormous

public concern about which she learned on the job. Most recently, the Court in

*Kennedy v. Bremerton Sch. Dist.*, reconciled *Garcetti* and *Lane* to strongly

emphasize that rigorous scrutiny must be applied to all claims by government that

it is denying protection to speech because it has effectively paid for it through

wages:

> In *Garcetti*, the Court concluded that a prosecutor's internal memorandum to a supervisor was made "pursuant to his official duties," and *** the prosecutor's speech "fulfilled a responsibility to advise his supervisor about how best to proceed with a pending case." In other words, *** *it was speech the government "itself had commissioned or created" and speech the employee was expected to deliver* in the course of carrying out his job.
>
> By contrast, in *Lane* a public employer sought to terminate an employee after he testified at a criminal trial about matters involving his government employment. The Court held that the employee's speech was protected by the First Amendment. In doing so, the Court held that *the fact the speech touched on matters related to public employment was not enough to render it government speech*. *** It is an inquiry this Court has said should be undertaken "practically," rather than with a blinkered focus on the terms of some formal and capacious written job description. To proceed otherwise would be to *allow public employers to use "excessively broad job descriptions" to subvert* the Constitution's protections.
>
> *** When Mr. Kennedy uttered the three prayers that resulted in his suspension, he was not engaged in speech "ordinarily within the scope" of his duties as a coach. He did not speak pursuant to government policy. He was not seeking to convey a government-created message. *** Simply put: Mr. Kennedy's prayers did not "owe their existence" to Mr. Kennedy's responsibilities as a public employee.

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2424 (2022), emphasis added,

internal citations and brackets omitted. Whether under the First Amendment or §

2302(f)(2), the Board overly emphasized the fact that Farrington's disclosures were of a subject matter closely related to her job functions, but gave only general conclusions that her regular job duties compelled those disclosures. The burden for any defense is on the party asserting it, and in a WPEA case, the Agency bears the burden of showing officially articulated duties compelled the disclosures.

## XIV. CONCLUSION

The WPEA, imbued with bipartisan Congressional wisdom, offers expansive protections to federal employees who courageously disclose information they reasonably believe exposes violations of law, gross mismanagement, waste of funds, abuse of authority, or threats to public health and safety. The statutory amendments require the Board and courts to refrain from imposing restrictions on the channels through which disclosures are made. Sections 2302(f)(1)(A), (D), and (E) unequivocally extend protection to disclosures made through diverse channels, including direct communication to supervisors, oral discussions, and off-duty disclosures through unofficial means. Section 2302(f)(2) goes beyond channel considerations to give primary focus to the substantive content of the disclosures, subject to the very narrow restriction on full protection for whistleblowers who regularly investigate and disclose wrongdoing.

Petitioner respectfully urges this Court to reverse the Board's decision, declare that Section 2302(f)(2) does not apply to her case, and remand this matter

for further proceedings that adhere to the true spirit and intent of the Whistleblower

Protection Enhancement Act.

Respectfully Submitted by:

/s/ Thad M. Guyer

_____

Thad M. Guyer
Stephani L. Ayers
Thomas M. Devine

Attorneys for Petitioner

# ADDENDUM

**5 U.S.C. § 1221(e)**

(a) For the purpose of this subchapter—

(1) "employee" means—

(A) an individual in the competitive service—

(i) who is not serving a probationary or trial period under an initial appointment; or

(ii) except as provided in section 1599e of title 10, who has completed 1 year of current continuous service under other than a temporary appointment limited to 1 year or less;

**5 U.S.C. § 2302(b)(8) and (f)**

(b) Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority— ...

(8) take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of—

(A) any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences—

(i) any violation of any law, rule, or regulation, or

(ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety,

if such disclosure is not specifically prohibited by law and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs;

(B) any disclosure to the Special Counsel, or to the Inspector General of an agency or another employee designated by the head of the agency to receive such disclosures, of information which the employee or applicant reasonably believes evidences—

(i) any violation (other than a violation of this section) of any law, rule, or regulation, or

(ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety; or

(C) any disclosure to Congress (including any committee of Congress) by any employee of an agency or applicant for employment at an agency of information described in subparagraph (B) that is—

(i) not classified; or

(ii) if classified—

(I) has been classified by the head of an agency that is not an element of the intelligence community (as defined by section 3 of the National Security Act of 1947 (50 U.S.C. 3003)); and

(II) does not reveal intelligence sources and methods.

(f)

(1) A disclosure shall not be excluded from subsection (b)(8) because—

(A) the disclosure was made to a supervisor or to a person who participated in an activity that the employee or applicant reasonably believed to be covered by subsection (b)(8)(A)(i) and (ii);

(B) the disclosure revealed information that had been previously disclosed;

(C) of the employee's or applicant's motive for making the disclosure;

(D) the disclosure was not made in writing;

(E) the disclosure was made while the employee was off duty;

(F) the disclosure was made before the date on which the individual was appointed or applied for appointment to a position; or

(G) of the amount of time which has passed since the occurrence of the events described in the disclosure.

(2) If a disclosure is made during the normal course of duties of an employee, the principal job function of whom is to regularly investigate and disclose wrongdoing (referred to in this paragraph as the "disclosing employee"), the disclosure shall not be excluded from subsection (b)(8) if the disclosing employee demonstrates that an

employee who has the authority to take, direct other individuals to take, recommend, or approve any personnel action with respect to the disclosing employee took, failed to take, or threatened to take or fail to take a personnel action with respect to the disclosing employee in reprisal for the disclosure made by the disclosing employee.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 27, 2023, I caused the Opening Brief of Petitioner to be served through this Court's electronic filing system on all counsel of record.

/s/ Thad M. Guyer

_____

Thad M. Guyer

# RULE 32(A)(7)(C) CERTIFICATE

This brief complies with the type-volume limitation of FED. R. APP. P.

32(a)(7)(B) because:

> this brief contains 12,364 words, excluding the parts of the brief
> exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FED. R. APP. P.

32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

> this brief has been prepared in a proportionally spaced typeface using
> Open Office in 14-point proportional typeface, Times New Roman.

Dated: September 27, 2023          Respectfully submitted by:

/s/ Thad M. Guyer
_____
Thad M. Guyer